Good morning, Your Honors, and may it please the Court. My name is Sabrina DeMast, and I represent the petitioners in this matter. I would respectfully request to reserve four minutes for rebuttal. Keep your eye on the flag. We'll try to help you. Yes, Your Honors. Thank you. Your Honors, the agency's decision in this matter should be reversed for four reasons. First, Jose Sr., the persecutor's allegedly violent nature, does not undermine the conclusion that he persecuted the petitioners on account of their memberships in their particular social groups. Secondly, Your Honors, the lead petitioner's ability to physically leave her marital home does not equate with the ability to leave her abusive marriage. Third, Your Honors... But with respect, isn't that really our focus today, is whether she was able to leave and what that means? Your Honor, it is definitely one of the points, because the Board of Immigration Appeals determined that she was not, in fact, a member of her proposed social group. And I'm happy to begin with that point, if that's of the most interest. It's up to you, but I just wanted, for my purposes, to focus it. Yes, Your Honor. So I'll lay out my other two points, and then I'll begin with the one that you're interested in, Your Honor. The other two points are that the agency wrongly determined that the Mexican police's mere response to the phone calls of the lead petitioner's in-laws shows an ability and a willingness to assist her, to protect her from her abusive spouse. And finally, that the agency applied the wrong legal standard to both petitioners' withholding of removal claims. Turning to Your Honor's point about whether or not the lead petitioner is, in fact, a member of her proposed social group, the Board of Immigration Appeals essentially relied on the idea that in 2013, she was able to physically leave her marital home. She went to Tijuana in order to take care of her ill mother, and that that is sufficient to demonstrate she was able to leave her marriage. Your Honors, this is contrary to the BIA's own cases on this topic, which I have submitted to the court. Specifically, Your Honor, I would point the courts to matter of SVC and matter of HRM, both of which recognize that even when an abused spouse or domestic partner physically leaves the marital home, if the abuser continues to threaten that person or to attempt to exert control over them, then they have not successfully left the relationship. And we have the same type of circumstances here, Your Honor. So come to Tijuana physically to pursue her during the time that she was there? He did not physically come, Your Honor. However, he threatened to do so, and he told her that if he found her with another partner, he would kill her. He threatened her that he was now a member of a cartel and that he would kill her. He told her she needed to return home to him and Michoacan, and when she said she tried to convince him not to come look for her in Tijuana, again, he threatened to come after her. These are all in the record, Your Honor. At page 79, the judge recognized that after the lead petitioner went to Tijuana, her husband called her and said he was going to come to Tijuana. She testified, the lead petitioner at 201, that he threatened to kill her if she left him. At pages 203 and 219, there is testimony about him calling her in Tijuana and saying he was coming there, and when she tried to persuade him not to come, he threatened to kill her if he found that she was living with someone else. I think this, in many ways, is perhaps the most persuasive point. Threatening to kill your partner if you find that they've tried to engage in a romantic relationship with another individual is proof that the persecution was because that Jose Sr. was trying to keep her trapped in their marital relationship. Your Honors, I would also point to the decision in matter of IMEG, which was one of the unpublished decisions submitted to the court. I think it's very illustrative on this point. In that case, you had an applicant who was unable to leave her domestic relationship for 10 years when she resided with her abusive partner, and when she tried to leave, he threatened to kill her, which is precisely what happened here. In addition, Your Honor, there was no analysis by the BIA about whether or not in the 10 years that she was residing with her spouse, whether at any point during those 10 years, she was a woman unable to leave her marriage. This is a particularly important point because if at any point in that 10 years she was being persecuted on account of her inability to leave her marriage, then the she would have demonstrated past persecution on account of her protected ground at some point. And this is the matter of SVC case is very illustrative on that point. You had an individual who lived with her abusive partner for seven years, and subsequently she moved to her mother's home for two years prior to fleeing the country. And even though she had been physically separated from her partner for those two years prior to leaving the country, the BIA remanded the case to the judge in order to determine if at any point during those seven, or actually they did determine that during those seven years, she had been the victim of past persecution. And so they remanded to the IJ in order to determine if she was eligible for humanitarian asylum based on those seven years of abuse. So from your perspective, if a person in an abusive relationship leaves, physically leaves, and is not in the presence of the abusing spouse, that as long as the abusive spouse calls and threatens to kill or otherwise injure the person, that's all you need to have in order to remain in the group, in the particular social group. I think, Your Honor, that the evidence has to establish that the abusive spouse was continuing to assert control over the life. Is it psychological control? I mean, what I struggle with, I mean, these are horrible cases. We get lots of them, as you know. And the reality is that this person was able to physically leave. She could have filed for divorce. She didn't file for divorce. When they called for the police, they never found him, but they came. So this is, it's maybe not unlike some parts of our own country where we have situations like that. And I struggle with an acceptance of your contention that the BIA's precedents bind us on this, that somehow all you have to have for somebody who's actually physically left the relationship and is no longer physically abused, as long as they get a phone call saying, I'm going to kill you, they still remain part of the group. Is that your position? In this case, I think you have more than a phone call. So I wouldn't say it's my position. I think you have multiple threats of death. The use of intimidation by saying, I'm a member of a cartel. You also have... If the person intimidates the spouse, that's all you need, right? You also have here, Your Honor, that he retaliated by beating his son even harder after his wife had left the home. And that's in the record at page 832. And that's in line with the decision of matter of HRM from the board, which found that having a child with an abuser would make it difficult to leave the relationship, even if the relationship was of a short duration. And here we have a relationship of 10 years. Can you address, particularly with respect to Isaac, whether or not the BIA's application of the wrong standard in terms of nexus on the withholding claim was or was not harmless? It's not harmless in either case, Your Honor. This case was decided by the BIA prior to this court's decision in Barajas-Romero. And so they only cite the one central reason standard and determined that under the asylum analysis, that the membership in the particular social groups is not one central reason for Jose Sr.'s persecution of his wife and son. And then when they get to the withholding analysis, they simply say, having failed to meet the higher standard for withholding without having analyzed whether or not the persecution may or excuse me, the protected ground may have been a reason for the persecution suffered. So I would say it's not harmless in either case. What's the best evidence that it was a reason? 2.2 in the record that supports that. In terms of the leave petitioner or the mail petitioner, Your Honor? Well, principally the mail petitioner, but I'd be interested in what you have on both. Well, Your Honor, the reason that the BIA really in both cases found there was no nexus is this idea that he was a generally violent person and therefore any violence against anybody was untethered to a protected ground. So I think there's two flaws in this. One is logical and one is factual in the record. I think the logical flaw in this is best illustrated with a historic example from real life. So in Nazi Germany, the SS engaged in a violent purge of the SA, which was a rival police organization. By all accounts, the SA was made up of the same ethnic and religious demographics as the SS. There was no belief that this was a religious or ethnically based act of violence. And yet I don't think anybody here would doubt that the SS engaged in systematic religious persecution of Jews during World War II. And so there's a logical flaw in saying that a person who may commit acts of violence against others for reasons untethered to a protected ground, therefore isn't persecuting anybody on account of a protected ground. On the factual basis in the record here, Your Honors, one of the things that the BIA points to to substantiate its conclusion that he's a generally violent person was they claim he was violent towards his own parents. And yet, Your Honors, if the record, which is where the lead petitioner actually testifies about the relationship between her husband and his parents, she clearly says he never hit them, that he was rude, but he never physically harmed his parents. And his parents submitted- Threatened him in the same way that he threatened her? No, Your Honor. There's nothing about threats. All she said is he's rude to his parents. And the parents themselves submitted declarations at pages 575 and 578 in which they mention only violence against the lead petitioner and her children. Nothing about him threatening or harming them, his parents, in any way. So this factual conclusion is simply not substantiated in the record, Your Honor. Your Honors, I see I have 23 seconds left of what I was going to use. Want to save the whole thing for rebuttal? So I will save the rest for rebuttal, Your Honors. Thank you. Good morning. Good morning. May it please the Court, my name is Margo Niffin for the United States Attorney General. Your Honors, it is undisputed that the petitioners in this case experienced a terrible ordeal in Mexico. Nevertheless, they failed to establish their eligibility for asylum, withholding of removal, and protection under the Convention Against Torture. Namely, the record does not compel reversal of the agency's finding that Ms. Acosta failed to establish her membership in her proposed social group, a nexus to a protected ground, or that the Mexican police were unable or unwilling to assist her. It's the only ground that you're relying upon in this Court with respect to Isaac, the nexus grounds? That is correct. And no other ground as to Isaac? Yes, the nexus ground is dispositive to his case. Okay. Now, isn't it clear in light of our decision in Barajas-Romero that the BIA did not apply the correct standard in Isaac's case with respect to the nexus issue, which is all you have? So in Barajas, the Court looked at a case of mixed motives and said that whereas for asylum the standard is one central reason, for withholding it's only a reason. However, Barajas does not apply in this case because, as the agency found, this is not a case of mixed motives. This is not a case where there was any record shows any motive whatsoever, any connection between the mistreatment that they experienced and their membership in their proposed social group. Where did the agency say that? Because when I look at the decision on all I see is, I'm looking at page four, they're invoking the one central reason standard and saying that he didn't establish that membership in the family was one central reason. Where did they say it wasn't a reason at all? They mentioned the one central reason standard because that was the standard at the time for both asylum and withholding of removal. But if you looked at the substance of the agency's decisions, they say that there's no connection, that Mr. Martinez was an indiscriminately violent person, which the record shows, that he would abuse drugs and alcohol and lash out at whoever happens to be around him. They didn't conduct the mixed motive analysis that would be required to determine. But saying that he, I mean, saying that a person is generally violent does not negate the possibility that there might be a reason, like membership in a family, that he would be particularly violent to some people. So I don't see that as addressing the a reason standard. Definitely. Under Elias Zacharias, motive is critical. And as the agency found, there's no evidence of motive at all. If you look at the record, there's no connection. In Barajas, this court cited to Zatino as example of a not a mixed motive case. In Zatino, the court said that an alien who wishes to be free of general violence does not establish a nexus to a protected ground. So this court distinguishes cases that implicate mixed motives versus cases that show no motive at all. And this case is similar to Zatino, as the agency found, in that it's a case that has no motive. Mr. Martinez lashed out at whoever happened to be around him. What do you make of counsel's point that the record is clear that he did not do that towards his parents, so that there was a difference in how he was violent and perhaps the distinction between how he treated his parents and how he treated his wife and son indicate that there is a distinction? Counsel referenced page 197 of the record. On that page, it does say that Ms. Acosta testified that he was aggressive towards his parents. In addition, he attacked Ms. Acosta's parents. On page 568 of the record, Ms. Acosta's mother indicated in her declaration that he really was a danger to the community in general. He would get drunk and get in fights in the street. He also murdered someone when he was in prison in the United States. And so although Ms. Acosta did not specifically testify that he attacked his own parents, he was aggressive towards his own parents and to everyone in the community, as the record indicates. She specifically said, she says he was rude to them, but she does say he never hit them. So that does seem to negate the suggestion of violence with respect to them. Again, she did indicate that he was aggressive towards them and she indicated that he was aggressive towards her stepfather. In fact, her stepfather, they were living with her in their house because Mr. Martinez would go after his stepfather. And again, if you look at Ms. Acosta's mother's declaration, he was violent towards everyone in the community. He was a drug addict who would use drugs and alcohol and get angry for no reason, as Ms. Acosta indicated in her declaration. I grant you that's all true, but under at least the withholding analysis, and we do have a reason. If he treated his wife and his son differently than he did anybody else, isn't that a reason that might satisfy the nexus for withholding purposes only? So looking at the two social groups, first we'd have to look at the social group for Mr. Martinez was motivated by their inability to leave in that when Ms. Acosta and Isaac both left the home, Mr. Martinez did not react at all. He did not pursue Ms. Acosta. He did not threaten her with any violence. And similarly, he did not pursue Isaac. That seems to be an overstatement that he didn't threaten her with any violence. Didn't he threaten that if she entered a new relationship while she was in Tijuana, he would kill her? That's after one year. So as the record shows, when Ms. Acosta in fact left in July 2013, Mr. Martinez did not pursue him at all. This is in stark contrast to the unpublished board decisions that Petitioner Council cites, where the abuser would threaten the petitioner and pursue them and stalk them. There's no evidence of that in this case. And then Ms. Acosta lived in Tijuana for one year without any violence. She testified that although she and Mr. Martinez spoke on the phone a few times, he only asked about the welfare of the children during those calls. Furthermore, after one year of him not coming to try to get her back, not threatening her in any way, he did express his interest in coming to Tijuana. However, Ms. Acosta testified that he didn't in fact come in the one month period that she remained there. And furthermore, there's no evidence that he came at any time after that, and they've not spoken. They've had no communication since July 2014. As you know, opposing counsel cited a number of board cases in which she indicates that, if I understood her correctly, for so long as the persecuting husband in this case continued to threaten whether or not there was physical violence, that was enough to continue the membership in the particular social group, even if the spouse physically left. What's your response to that? Well, again, the board decisions that she cites have no binding authority on this court. I get that, but the reasoning, what's yours? And again, those cases are distinct because there were attempts by the abusive partner to get the petitioner back in those cases, throughout when they left and then after that, and the abusive partner was pulled back into the relationship. This case is factually distinct from that, in that she lived for one year without any harm. So the record would have to compel, this is a factual issue, the record would have to compel reversal of the agency's finding that, based on these facts, she was able to leave Mr. Martinez. She was able to leave Tijuana, many miles away, for one year, safely, without any threats of harm, which again is factually distinct from the cases that Petitioner's counsel cites. I gather that you would also, that the government's position is that even if there was a little play in the joints on that part of it, that the reality is that the police did respond. They didn't find him, but they did respond. This is not a situation where the government of Mexico simply turns a blind eye to this. Is that correct? That's correct. This case is factually distinct from ARCG, where the police told the petitioner that they would not assist her because they would not become involved with marital disputes. In this case, when Ms. Acosta's in-laws called the police, they responded, they came to the home and they attempted to arrest Mr. Martinez. They were only unable to because he had fled the scene. That is another aspect of showing that Ms. Acosta was able to leave the relationship. What's the government's position on the status of ARCG? If we send this back to the agency for any reason, would that make it then, would the agency then be free to invoke manner of AB, which has cut back on ARCG? What's the government's position on that issue? Well, it's unnecessary given the dispositive grounds that the agency relied on. In this case, the court could deny on those dispositive grounds. No, but I'm saying, if we send it back, what would the government's position be on the agency's ability to invoke manner of AB? AB would apply in the analysis of the cognizability of her group, if it were to go back to the agency. In addition, we discussed the membership in Ms. Acosta's group as well as Nexus. In addition, the record does not compel reversal of the agency's finding that the Mexican police were unable or unwilling to assist her. As we discussed, the police arrived at her home, responded, and attempted to arrest Mr. Martinez. Accordingly, the court should deny this petition for review as it relates to Ms. Acosta and Isaac's applications for asylum and withholding of removal. The court should also deny the petition as it relates to the petitioner's applications for protection under the Convention Against Torture. Substantial evidence supports the agency's position that a Mexican official would not acquiesce to any torture that they would experience upon their return. Accordingly, the court should deny the petition for review. Thank you. Thank you very much. Well, you heard your opponent. I did, Your Honor, my esteemed former colleague and her excellent oral argument. Your Honors, I'd like to respond to one point with respect to the issue of whether or not the persecutor reacted after his wife left him and then also turn to the issue of government inability to protect unless the court has other questions on the previously discussed matters. It is 100% clear in Jose Isaac's declaration at page 832 that after his mother left his father, his father beat him harder. I cannot imagine for a woman trying to flee an abuser a more difficult task than to beat her children harder because she left. He joined his mother within, what, two months, three months? I think it was five or six months in the record, Your Honor. At least for a part of that year that your esteemed former colleague referred to, Isaac was not with his father or near his father. What role, if any, should that play in our analysis? Your Honor, I think this goes back to the fundamental question. If at any time during the 10 years she was a woman unable to leave her marriage, let's assume for argument's sake that at that six-month mark when her son joins her and her husband no longer has the ability to beat him to control her and perhaps, as you've suggested, Your Honor, that his death threats on the phone to her a month before she left, if she should find a new partner, is not sufficient control to show she was still stuck in the marriage. I'm not asking. I'm not saying it isn't. No, no. Understood. We, as we talked about, we have so many of these cases that come in bushels, and we have to weigh based on a cold record what the law is. These are heart-rending cases. There's no question about that. I'm not being flipped when I ask you that, but I don't know of any cases that we have or that are binding on us that say what you contend. So that's why I'm trying to ferret this out. Well, Your Honor, I don't think this Court issued a published decision interpreting ARCG, so we don't have a, you're correct. The principle of, if you will, psychological coercion, to what degree that plays a role in keeping someone in a group when they physically leave, that's what I struggle with. Well, Your Honors, there's a lot of evidence in the record about the dynamics of domestic violence relationships, including a report from a therapist treating the lead petitioner about how psychological coercion keeps a woman trapped in her relationship as much as physical beating. So I think that it would be inappropriate to devalue psychological coercion, especially in the context of 10 years of physical and sexual abuse leading up to it, not to mention the psychological, physical, and mental harm she suffered from other individuals that left her conditioned, as her therapist noted, to not even be able to recognize the red flags of domestic violence in her life. She'd been raped as a child by an acquaintance, molested by her stepfather, her father attempted to poison her as a child. I mean, this woman was left in a position where she didn't understand that men could treat her well. And I think that goes to the topic. Briefly, Your Honor, I just want to note two cases that should dispel the idea that merely responding and taking a police report, which there isn't even evidence of a police report taken, is sufficient to demonstrate that the government is able and willing to protect. There's matter of O.Z. and I.Z. 22 INN Decision 23, BIA 1998, where the board concluded that the police taking a report about death threats was not sufficient to demonstrate an ability to control the persecutors. And this court's decision in Mashiri v. Ashcroft, 383 F. 3rd, 1112, 2004, the police responded to the scene of an assault, but made no arrest, quickly closed an investigation into a break-in at the petitioner's home, and there was evidence in the record that the police in that country had bias against foreigners and ethnic minorities. Your Honor, I cannot cite enough places in the record in which it is clear that DV laws, domestic violence laws, are not adequately enforced, and that the police consider domestic violence to be a private matter, but I'll just leave you with one with my remaining few seconds here. There is, page 704 of the record, there is still insufficient understanding or acknowledgment by many senior officials, particularly at the state level, that violence against women constitutes a serious human rights violation, and that the state has a responsibility to take appropriate steps to prevent it. This is particularly true of violence against women by intimate partners in the family or in the home, which is still wrongly portrayed as a private matter. That's a direct quote, Your Honor. I agree this is a serious, serious problem. We have that problem here in the United States, as you know. We're no different than anybody else in that problem. Our problem, at least I believe, is that under the case law and under the regulations that we deal with, I'm not finding authority to allow us to take the very important psychological, sociological impact of these horribly abusive relationships as controlling on whether somebody is a member of a social group. There may be individual instances where the role is so clear that there's no problem, but frankly, women are so poorly treated in so many places and around the world, including here many times, that as far as I know, Congress has simply not spoken on this. I don't think the agency has spoken on it. Where am I wrong on that? Your Honor, I'm out of time. May I respond? As long as you answer my question, that's fine. Okay. Yes, Your Honor. Well, I'm going to answer it with two different ideas that I hope will answer your question. One is in terms of the idea of women and this court specifically recognizing the poor treatment of women as perhaps being social grounds, I would point to the court's decision in Perdomo v. Holder, where it considered that Guatemalan women may in fact be a social group because of the pervasive violence against women in Guatemala. Now, more specifically to Your Honor's question about where there's authority for taking into account psychological harm, for example, I would point to the CAT regulations, right? The Convention Against Torture regulations explicitly state that psychological torture exists, right? And it's defined as the threat of serious harm to the individual or to their case law in Avendano-Hernandez that torture rises to the level of persecution. So if psychological harm is relevant to the question of torture, then I think it has to be relevant to the question of persecution of women as well. And that's why you make the claim about humanitarian, if you will, relief because it's torture to a degree that's so shocking that it falls within our definition of humanitarian relief. Well, so I think there's evidence in the record of sexual assault by the husband and that under Avendano-Hernandez would be past persecution. So I return to my prior statement, Your Honor. Even if we, let's suppose for a moment, we assume that she did escape her relationship at the moment she left or at the moment perhaps her son left to join her. The question remains if at any years during, excuse me, at any time during the prior 10 years when she was living with her spouse and he was abusing her physically and sexually and psychologically and he was abusing their children, at any point in those 10 years, was she a woman unable to leave her marriage? From your perspective, if there's an instant of time, not trying to be fully facetious, if there's an instant of time within that 10 year period, that's enough to permanently enshrine her as a member of this particular social group. It doesn't permanently enshrine her, but it enshrines her at that moment. I mean, Your Honor, I would counter with the question of if a political dissident is jailed 10 years ago because of his political activism and then he stops being a political activist and isn't jailed, he still has past persecution on account of a protected ground even if his status as a political dissident has changed because he's no longer politically active. Maybe that goes to questions of are there changed circumstances that would rebut a well-founded fear, but that's also where humanitarian asylum comes into play. If the well-founded fear is rebutted by changed circumstances in the country of origin, such as, for example, a woman's ultimate ability to finally leave her persecuting spouse, did she suffer such significant harm in the past, such as sexual abuse, that it would rise the level of qualifying for humanitarian asylum? Or, you know, convert or relatedly, would she suffer such serious unrelated harm, which is the other ground for humanitarian asylum, that she would qualify? Let me ask my colleagues if either of you have any additional questions. We appreciate your additional comments. I don't mean to cut you off in any way, but as we just had the one case, this is an important issue. It really is. We thank you very much, both of you, for your argument. The case just argued is submitted, and the court stands adjourned for the week. And the weekend, most importantly. All rise. This court for this session stands adjourned.
judges: M. Smith, Miller, Collins